**COLIN M. RUBICH**
Assistant U.S. Attorney
U.S. Attorney's Office
James F. Battin U.S. Courthouse
2601 Second Ave. North, Suite 3200
Billings, MT 59101
Phone: (406) 657-6101
FAX: (406) 657-6989
E-Mail: Colin.Rubich@usdoj.gov

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | CR 18-85-BLG-DLC |
| Plaintiff, | CR 18-149-BLG-DLC |
| vs. | **OFFER OF PROOF** |
| **LARRY WAYNE PRICE JR.,** *aka L.J. Price*, | |
| Defendant. | |

The United States of America, represented by Assistant United States Attorney Colin M. Rubich, files its offer of proof in anticipation of the change of plea hearing set in this case on December 18, 2018.

1

## THE CHARGE

The defendant, Larry Wayne Price Jr., aka L.J. Price, is charged in CR 18-85-BLG-DLC by information with three counts of wire fraud, in violation of 18 U.S.C. § 1343 and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).   In CR 18-149-BLG-DLC, the defendant is charged by indictment with a three counts of false official statement in violation of 18 U.S.C. §1001(a)(2).

## PLEA AGREEMENT

There is a plea agreement in this case.   Price will plead guilty to all four counts in the superseding information in CR 18-85-BLG-DLC and count II of the indictment in CR 18-149-BLG-DLC.   The United States will dismiss the indictment in CR 18-85-BLG-DLC and counts I and III of the indictment in CR 18-149-BLG-DLC at time of sentencing.   The United States presented all formal plea offers to Price in writing.   The plea agreement entered into by the parties and filed with the Court represents, in the government's view, the most favorable offer extended to the defendant.   *See Missouri v. Frye*, 566 U.S. 133 (2012).

## ELEMENTS OF THE CHARGE

In order for Price to be found guilty of the counts I-III contained in the information, Wire Fraud, in violation of 18 U.S.C. § 1343, the United States must prove each of the following elements beyond a reasonable doubt:

> **First**, the defendant knowingly devised a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;
>
> **Second**, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;
>
> **Third,** the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and
>
> **Fourth**, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

In order for Price to be found guilty of the counts IV contained in the information, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), the United States must prove each of the following elements beyond a reasonable doubt:

> **First,** there was an agreement between two or more people to commit certain offenses under 18 U.S.C. § 1956, to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud; and;

**Second,** the defendant entered the agreement knowing of its objectives and intending to accomplish at least one of those objectives.

In order for Price to be found guilty of count II contained in the indictment in CR 18-149-BLG-DLC, false official statement, in violation of 18 U.S.C. §1001(a)(2), the United States must prove each of the following elements beyond a reasonable doubt:

**First,** the defendant made a false statement;

**Second,** the statement was made in a matter within the jurisdiction of the Federal Bureau of Investigation and the Internal Revenue Service;

**Third,** the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful; and

**Fourth,** the statement was material to the activities or decisions of the Federal Bureau of Investigation; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

## PENALTY

Each charge contained in the information carries a maximum penalty of twenty years imprisonment, a $250,000 fine, three years of supervised release, and a $100 special assessment.   The charge in the indictment carries a maximum penalty of five years imprisonment, a $250,000 fine, three years of supervised release, and a $100 special assessment.

**ANTICIPATED EVIDENCE**

If this case were tried in United States District Court, the United States would prove the following:

From approximately October of 2016 Until April of 2018, Larry Wayne Price Jr. *aka L.J. Price,* embezzled approximately $20,321,134.00 total from three companies: Ninety M, L.L.C., a Wyoming company consisting of several wealthy investors looking to invest large sums in coal mining endeavors ("Ninety M"); Three Blind Mice, LLC, another Wyoming company consisting of several wealthy investors looking to invest large sums in coal mining endeavors ("Three Blind Mice"); and Signal Peak Energy, a Montana company engaged in coal mining activities ("Signal Peak").   During much of the scheme Price worked as Vice President of Surface Activities at Signal Peak.   Price also operated a private business called 3 Solutions, LLC, ("3 Solutions") that was involved in a variety of activities related to coal mining, although its principle purpose was to supply chemicals to Signal Peak.

Price had developed a reputation in Billings and elsewhere as an expert in coal mining.   Based on this reputation, in the fall of 2016, Price convinced Three Blind Mice to lend him $7,500,000.00, which he then stole.   Price stated that 3

5

Solutions, as a part of its business, had secured a contract with a Pennsylvania coal company to install coal mining equipment. To complete the project, Price claimed he needed $7,500,000.00 for expenses.

Price proposed that Three Blind Mice lend him the $7,500,000.00, and in repayment, he would pay Three Blind Mice $11,000,000.00 on January 31, 2018. Three Blind Mice agreed, and Three Blind Mice and Price signed an unsecured promissory note on the terms described above. The money was wired interstate to 3 Solutions in several separate transactions. One of these interstate wires occurred on October 6, 2016 between an account at First Interstate Bank in Casper, Wyoming and an account at Rocky Mountain Bank in Billings Montana, and represented the transfer of approximately $2,500,000.00.

On January 31, 2018, Price defaulted on the loan. Later investigation concluded that there was no contract between 3 Solutions and a Pennsylvania coal mine and that none of the money lent to Price was used for such a contract. Instead, Price merely misappropriated the $7,500,000.00 and spent it on unrelated expenses.

At the same time, in 2017, Price convinced Ninety M's investors to allow him to act as a representative of the company. In this capacity, Price was principally supposed to help Ninety M purchase and develop a coal mining

property located in Tazewell, VA and also help develop other coal related ventures.

On or about March 29, 2017, Ninety M had negotiated to buy a coal press from a company called Seneca Coal Resources, LLC ("Seneca"). The cost of the equipment and transportation costs totaled $1,075,000. To facilitate this deal, Ninety M and Seneca Coal Resources, LLC used another company called Peters Equipment Company ("PEC") as an intermediary. Price falsely told the investors of Ninety M that the cost for the coal press was $2,400,000.00. Based on this, Ninety M transferred $2,400,000.00 to PEC. PEC then sent the extra $1,325,000.00, to an account for 3 Solutions controlled by Price and he misappropriated the funds.

Price defrauded Ninety M again on or about June 7, 2017. One of the first duties Price had as a representative of Ninety M was to broker the sale of the coal mining property in Tazewell, VA between the seller and Ninety M. The seller eventually agreed to sell the property for $2,100,000.00 million dollars. After the seller disclosed this to Price, Price falsely told the investors of Ninety M that the purchase price for the property was $6,100,000.00. Based on this misrepresentation, Ninety M transferred $6,100,000.00 to a law firm working for Price. Price, with the law firm's assistance, then transferred $2,100,000.00 to the

7

...

seller and transferred the remaining $4,000,000.00 to an account Price controlled. The property was deeded to a subsidiary company of Ninety M, but Ninety M never received the actual sales contract. Instead, Ninety M received a transaction summary from Price and the law firm that falsely claiming the cost of the property was $6,100,000.00.

On or about September 27, 2017, Price convinced Ninety M to transfer another $2,900,000.00 to him, which he then embezzled. On this occasion, Price claimed he was using the money to buy mining equipment for Ninety M. Price claimed that his company 3 Solutions was in the business of buying and selling heavy mining equipment and could purchase such equipment for significantly less money than Ninety M could. Based on this, Ninety M transferred the money to 3 Solutions. Price never bought any mining equipment with these funds and simply stole the money.

On November 8, 2017, Price again convinced Ninety M to transfer $1,800,000.00 to him. On this occasion, Price stated that he could, through 3 Solutions, purchase a specific piece of mining equipment and then sell it for a significant profit to a company called Arcelor-Mittal. Price stated that, if Ninety M loaned him the money to purchase the equipment, a he would give substantial portion of the profit to Ninety M. Though the money was transferred to Price, he

never purchased the equipment and absconded with the money.   When the investors of Ninety M later called Arcelor-Mittal, they were informed that Price did not have an agreement to purchase anything from Arcelor-Mittal and that no one at Arcelor-Mittal had any knowledge that such an agreement existed.

On January 9, 2018, Price convinced Ninety M to transfer $300,000.00 to him.   On this occasion, Price stated that he had a buyer for a quantity of coal belonging to Ninety M.   To meet the buyer's specifications for the coal, however, Price claimed he needed to buy $300,000.00 of a different kind of coal to mix with it.   Upon later investigation, no buyer for this coal existed and Price did not buy $300,000.00 worth of coal.   Instead, he simply stole the money.

In total, Price solicited approximately $13,500,000.00 from Ninety M of which $10,475,000.00 was fraud.   As a part of this scheme, on July 3, 2017, Price initiated an interstate wire between an account at Summit Community Bank in West Virginia and an account at Rocky Mountain Bank in Billings Montana which represented the transfer of approximately $3,990,000.00.

While these events were occurring, Price was still employed by Signal Peak as the Vice President of Surface Operations through much of 2017.   In March 2017, Price fraudulently induced Signal Peak to purchase equipment related to coal mining from Peters Equipment Company ("PEC"), knowing that PEC would not

actually provide the purchased equipment to Signal Peak. PEC then funneled the money back to Price through a bank account in Montana registered to 3 Solutions. This scheme defrauded Signal Peak of approximately $2,396,134.00. As a part of this scheme, on March 30, 2017, Price initiated an interstate wire between an account at Stockman Bank in Billings, Montana and an account at First Century Bank in Bluefield, West Virginia, which represented the transfer of approximately $750,000.00.

From October 2016 until April of 2018, Price, in concert and conspiring with several other individuals known to the government, routinely conducted financial transactions designed to mask the fraudulent nature of the $20,321,134.00 that Price had stolen. Some of these transactions included bank accounts controlled by Three Solutions and the transactions were designed to make it appear that Price and Three Solutions had received these funds as the result of legitimate business activities.

In April of 2018, the investors of Ninety M began to question some of the transactions Price had been involved in, and had confronted Price about them on the phone. By this time, Price had returned to Virginia, where he was originally from, and was residing there. Around April 18, 2018, Price discovered that Ninety M was sending some presentatives to confront him about the fraudulent

transactions, and he decided he needed to find somewhere to hide.   Price contacted a woman he knew and eventually agreed to hide at a house that the woman had rented.

On April 18, 2018, Price's wife reported him missing to authorities in Virginia.   Local law enforcement was mobilized.   Late that night, Price was spotted by a driver standing on the side of a road in Gratton, VA.   He was taken to a hospital for treatment and released.

Price was subsequently questioned by several law enforcement agencies. In these statements, Price falsely claimed he had been kidnapped by men who may have been associated with an outlaw motorcycle gang.   One of these statements was given to the Federal Bureau of Investigation and the Internal Revenue Service on April 20, 2018.

Specifically on April 20, 2018, Price stated he had been approached by an unknown man who discussed the possibility of selling a motorcycle to Price. Price stated he agreed to meet this man at a park and ride.   Price stated that when he went to the park and ride the unknown man arrived with a windowless van and accompanied by another unknown male who pointed a gun at him.   Price claimed the second man then applied a rag with chemicals on it to Price's face that caused him to be disoriented.    Price then stated that the men took him to an unknown

location where he sat in a dark room on the floor for a period of time. Price stated the men eventually applied the chemical rag to his face again, and he then remembered the men threatening him and throwing him out of the moving van onto the side of road.

As Price then knew, none of these statements where true. Nor were any of the other statements he gave to law enforcement about his supposed abduction at this time. Price was not kidnapped by anyone at any time. These false statements were material as they cost the government significant resources to investigate and hampered the investigation into Price's own wrongdoing.

DATED this 17th day of December, 2018.

          KURT G. ALME
          United States Attorney

          */s/ Colin M. Rubich*
          COLIN M. RUBICH
          Assistant U.S. Attorney